UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JOSEPH SKILKEN & CO.,               )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      2:15-cv-00161-JAW
                                    )
BERKLEY AVIATION LLC,               )
                                    )
            Defendant.              )


**ORDER ON MOTION FOR ORDER REDUCING PLAINTIFF JOSEPH SKILKEN & CO.'S AWARD OF DAMAGES**

In this reach and apply action, the Court grants in part and denies in part the Defendant insurer's motion to reduce the damages the Court previously awarded by default judgment against the insured entity.

## I.      PROCEDURAL HISTORY

This lawsuit follows another.

### A.      Joseph Skilken & Co. v. Oxford Aviation, Inc.: 2:13-cv-00322-JAW

The first lawsuit began on August 21, 2013, when Joseph Skilken & Co. (Skilken) filed a civil action against Oxford Aviation, Inc. (Oxford) in this Court. *Joseph Skilken & Co. v. Oxford Aviation, Inc.*, No. 2:13-cv-00322-JAW, *Compl.* (ECF No. 1). Skilken served Oxford on August 26, 2013. *Summons in a Civil Action* (ECF No. 7). After Oxford failed to file a timely answer, on September 18, 2013, Skilken filed a motion for entry of default. *Pl.'s Req. for Entry of Default* (ECF No. 8). On September 18, 2013, the Clerk of Court entered default against Oxford. *Order*

*Granting Mot. for Entry of Default* (ECF No. 8).  On October 16, 2013, Skilken moved for default judgment.  *Pl.'s Mot. for Default J.* (ECF No. 10).

On October 24, 2013, the Court issued an order, requiring Skilken to comply with *Key Bank v. Tablecloth Textile Co.*, 74 F.3d 349 (1st Cir. 1996), either by giving notice to Oxford of the damages hearing or by filing affidavits establishing that Oxford had not "appeared" within the meaning of *Key Bank*.  *Order on Mot. for Default J.* (ECF No. 18).  On November 15, 2013, the Court issued an order on Skilken's motion for default judgment, raising questions about two areas of claimed damages.  *Order on Mot. for Default J.* at 5-6 (ECF No. 21).   The Court ordered Skilken to file a further explanation of the bases for these two areas of claimed damages.  *Id.*

Specifically, in its November 15, 2013 Order, the Court expressed concern as to the propriety of aspects of the damages Skilken claimed were associated with replacement travel.  *Id.* at 5-6.  The Court wondered whether Skilken might have calculated the claimed damages in such a way as to include "expenses that it actually avoided while the Cessna was idle."  *Id.* at 6.  It also stated that "[o]f course, Mr. Skilken's personal trips could not be properly claimed as part of the damages suffered by the business."  *Id.*  Additionally, the Court observed that, by not crediting against its damages figure for replacement travel any expense that it would have incurred from using the aircraft, "Skilken has presented a gross damages figure but has failed to set forth a net damages figure."  *Id.*  The Court found that "[t]he remaining damages claims are in order," not requiring further inquiry.  *Id.*

On the same day, Skilken's counsel wrote to the Court, affirming that Skilken accepted a damages order without the two areas of damages the Court had questioned. *Notice Concerning Pl.'s Resp. to Order on Mot. for Default J.* (ECF No. 22). On November 28, 2013, the Court issued an order granting judgment in favor of Skilken and against Oxford in the total amount of $423,295.77. *Order on Mot. for Default J.* (ECF No. 23).[1] The Court confirmed that it found that Skilken had proven these elements of damage and that they were proper. *Id.* at 2.

**B.     Joseph Skilken & Co. v. Berkley Aviation LLC: 2:15-cv-00161-JAW**

On May 1, 2015, Skilken[2] filed a complaint in this Court against Berkley Aviation LLC (Berkley) claiming its right to reach and apply the proceeds of an insurance policy Berkley issued to Oxford in effect at the time of the event giving rise to the damages. *Compl. to Reach and Apply Insurance Benefits* (ECF No. 1). On June 30, 2015, Berkley answered the complaint. *Answer to Compl.* (ECF No. 6). On November 30, 2015, Skilken moved to amend the complaint to add a third count. *Pls.' Mot. to Amend Compl.* (*Consent Mot.*) (ECF No. 14). On December 1, 2015, the Court granted the motion to amend the complaint. *Order Granting Without Obj. Mot. to Amend* (ECF No. 16). On December 2, 2015, Skilken filed the First Amended Complaint. *First Am. Compl.* (ECF No. 18). On December 16, 2015, Berkley

---

[1]     Three days later, the Court issued an amended order, which corrected two typographical errors. *See Default J.*, *Joseph Skilken & Co. v. Oxford Aviation, Inc.*, 2:13-cv-00322-JAW (ECF No. 24).

[2]     The original Complaint included Karen Skilken as a plaintiff. *Compl. to Reach and Apply Insurance Benefits* ¶ 1 (ECF No. 1). On September 1, 2016, Ms. Skilken filed a Stipulation of Dismissal, signed by counsel for the Plaintiffs and Defendant, and she has been terminated as a party. *Stip. of Dismissal of Karen Skilken* (ECF No. 53). The remaining dispute is between Joseph Skilken & Company and Berkley Aviation LLC.

answered the First Amended Complaint. *Def.'s Answer to Pls.' Am. Compl.* (ECF No. 19).

On June 17, 2016, Skilken filed a motion to obtain a court order clarifying the effect of Berkley's June 17, 2016 tender of a check for $105,179.09 to Ms. Skilken. *Pls.' Mot. to Determine Effect of Tender* (ECF No. 34) (*Tender Mot.*). On July 8, 2016, Berkley filed its opposition. *Def. Berkley Aviation's Resp. to Pls.' Mot. to Determine Effect of Tender* (ECF No. 38) (*Tender Opp'n*).

On July 18, 2016, Skilken filed a motion for summary judgment, *Pls.' Mot. for Summ. J.* (ECF No. 39) (*Skilken Mot.*), with a statement of facts, *Pls.' Statement of Material Facts* (ECF No. 40) (PSMF), and a set of stipulated facts. *Stip.* (ECF No. 41). Skilken requested oral argument. *Skilken Mot.* at 1. On August 8, 2016, Berkley filed a response to Skilken's motion for summary judgment, *Def. Berkley Aviation's Opp'n to Pls.' Mot. for Summ. J.* (ECF No. 48) (*Berkley Opp'n*), and a response to its statement of facts. *Def. Berkley Aviation's Opposing Statement of Facts* (ECF No. 49) (DRPSMF). On August 15, 2016, Skilken replied to Berkley's opposition to its motion for summary judgment. *Pls.' Reply to Mem. in Opp'n to Pls.' Mot. for Summ. J.* (ECF No. 50) (*Skilken Reply*).

On July 18, 2016, Berkley filed a cross-motion for summary judgment, *Def. Berkley Aviation's Mot. for Summ. J.* (ECF No. 43) (*Berkley Mot.*), with a statement of facts. *Def. Berkley Aviation's Statement of Material Facts* (ECF No. 44) (DSMF). On August 6, 2016, Skilken responded to Berkley's motion, *Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 45) (*Skilken Opp'n*), and filed a responsive

statement of facts. *Pls.' Opposing Statement of Material Facts* (PRDSMF). On August 17, 2016, Berkley replied to Skilken's opposition to its motion for summary judgment. *Def. Berkley Aviation's Reply to Pls.' Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 52) (*Berkley Reply*).

On August 16, 2016, the Court granted the motion for oral argument, *Order Granting Mot. for Oral Arg. and Hr'g* (ECF No. 51), and on March 8, 2017, the Court held oral argument on the pending motions. *Min. Entry* (ECF No. 56). On March 15, 2017, the Court issued an order on the cross-motions. *Order on Mot. to Determine Effect of Tender & Cross-Mots. for Summ. J.* (ECF No. 57) (*Summ. J. Order*). The Court granted Skilken's motion on Count One of its Complaint only insofar as the Court determined that the Defendant is liable to the Plaintiff under 24-A M.R.S. § 2904, Maine's reach and apply statute. *Id.* at 40. The Court granted Berkley's motion on Count Two of the Complaint. *Id.* The Court dismissed both motions as to Count Three of the Complaint, and it denied the remainder of both motions. *Id.* at 40-41. At the urging of the parties, the Court left for later the reasonableness of the damages awarded in the default judgment against Oxford. *Summ. J. Order* at 1, 40.

That time arrived soon after the Court issued its order on the cross-motions for summary judgment. On April 20, 2017, Berkley filed a motion to reduce the damages the Court awarded Skilken in the default judgment against Oxford. *Def. Berkley Aviation's Mem. Regarding Pl.'s Alleged Damages* (ECF No. 63) (*Def.'s Mot.*). Berkley filed twelve attachments with its motion. *Def.'s Mot.* Attachs. 1-12. Skilken filed its opposition on May 11, 2017, along with two attachments. *Pl.'s Obj. to Def.'s Mot.*

*Regarding Pl.'s Alleged Damages* (ECF No. 66) (*Pl.'s Opp'n*); *Id.* Attachs. 1-2. On May 25, 2017, Berkley replied and filed two attachments. *Def. Berkley Aviation's Reply to Pl.'s Obj. to Def.'s Mem. Regarding Pl.'s Alleged Damages* (ECF No. 67) (*Def.'s Reply*); *Def.'s Reply* Attachs. 1-2 (ECF No. 68). On June 2, 2017, Skilken filed a sur-reply. *Pl.'s Sur-Reply to Def.'s Reply to Pl.'s Obj. to Berkley Aviation's Mot. Regarding Pl.'s Alleged Damages* (ECF No. 72) (*Pl.'s Sur-Reply*). It filed two attachments. *Pl.'s Sur-Reply* Attachs. 1-2.

On June 9, 2017, the Court held a telephone conference with counsel during which it discussed its concern about the way the issues in the case had been framed. *Min. Entry* (ECF No. 74). The Court observed that Skilken's First Amended Complaint alleged that the hard landing of May 13, 2013 had proximately caused damages to Skilken and that Berkley had denied those allegations. Then, on March 15, 2017, the Court had issued an order, concluding that Berkley is liable to Skilken under the reach and apply statute but leaving open the question of damages. As the Court had understood the lawsuit, two questions were left for resolution: (1) what damages were caused by the hard landing; and (2) were the causally-related damages reasonable. The Court did not understand that there was a third issue, namely whether reasonable damages caused by the hard landing were excluded under the terms of the Berkley policy. Yet, in its filings, Berkley had raised a "Your Work" policy exclusion as a defense as regards the so-called "bad paint job" claim of $62,175. In response, Skilken questioned whether Berkley could raise a policy exclusion as a defense.

The Court discussed a distinction between causation and exclusion. The Court informed counsel that it thought Berkley was entitled to defend the reach and apply action based on its contention that the bad paint job had nothing to do with the hard landing because Skilken's civil action is premised on the allegation that its damages were caused by the hard landing.

However, the Court said it had doubts about whether Berkley could assert that, even though reasonable damages were caused by the hard landing, those damages were excluded under the terms of the policy. This is because an insurer is generally required to place the insured on notice as to the reasons a claimed loss is not covered under the terms of the policy. Here, as the Court understood it, Berkley merely informed Oxford that there was no coverage at all because the policy had lapsed, not that if the policy were effective, some elements of the claimed damages would not be covered.

The Court was not certain whether it would need to reach the issue because, if it concluded that the bad paint job was not caused by the hard landing, it would not need to address whether the bad paint job was covered or excluded under the policy. The Court suggested to counsel that they supplement their briefing to address the Court's concerns.

On June 20, 2017, Skilken filed a brief addressing these issues. *Pl.'s Additional Br. Concerning Berkley Aviation's Mot. Regarding Pl.'s Alleged Damages* (ECF No. 77) (*Pl.'s Addt'l Br.*). On June 28, Berkley filed its response with two attachments. *Def. Berkley Aviation's Resp. Br. to Pl.'s Additional Br. Regarding Pl.'s*

*Alleged Damages* (ECF No. 80) (*Def.'s Addt'l Opp'n*) Attachs. 1-2. Skilken replied on July 7, 2017. *Pl.'s Reply to Berkley Aviation's Resp. to Pl.'s Additional Br. Regarding Pl.'s Alleged Damages* (ECF No. 81) (*Pl.'s Add'l Reply*).

## II.    THE PARTIES' POSITIONS

### A.    Berkley's Motion

In its motion, Berkley reiterated the categories of damages that Skilken claimed leading to the Court's November 15, 2013 damages award to Skilken in the amount of $423,295.77:

(1) Repairs to the Cessna aircraft as a result of emergency landing, totaling $138,848.59;

(2) Repair of the defective work performed on the Cessna aircraft by Oxford in the amount of $62,175.00;

(3) Expenses from the unexpected stop in Colorado Springs, Colorado in the amount of $2,371.31;

(4) Expenses related to flight-testing the Cessna after the repairs in the amount of $2,425.79;

(5) Loss of use for the Cessna for three and one-half months in the amount of $53,840.00;

(6) Replacement travel during the period the Cessna was unavailable due to repairs in the amount of $17,475.08;

(7) Rental of a NetJets plane for a planned flight in the amount of $38,916.47;

(8) Rental vehicles for trips where the Cessna would have been used in the amount of $1,933.14; and

(9) Diminished value of the Cessna aircraft from repaired damage caused during the emergency landing in the amount of $200,000.

*Def.'s Mot.* at 1-2 (citing *Summ. J. Order* at 4-5). Noting that the Court expressed compunctions about items five, seven and eight, Berkley observed that Skilken withdrew those claims, which totaled $94,749.61, leading to a net damages award of $423,295.77. *Id.* at 2-3. Berkley affirmed that it does not challenge the reasonableness of Skilken's claimed damages as to categories one ($138,848.59 for repairs due to the emergency landing); three ($2,371.31 for expenses due to the unexpected stop in Colorado Springs); and four ($2,425.79 for expenses due to flight testing). *Id.* at 3. Berkley challenged the reasonableness of categories two ($62,175.00 to repair defective work Oxford performed on the Cessna), six ($17,475.08 for replacement travel during the time the Cessna was unavailable while being repaired), and nine ($200,000.00 for diminished value of the Cessna aircraft). *Id.* Thus, with Berkley's concessions, the area of dispute melted from $423,295.77 to $279,650.08.

### 1. The Defective Work Claim

In its motion, Berkley argued that Skilken's claim of $62,175 for Oxford's "bad paint job" is not the proper subject of the reach and apply action because it is not a covered loss under the Berkley policy. *Id.* at 3-4. Quoting 24-A M.R.S. § 2093, Berkley emphasized that a reach and apply action is proper only when a "loss or

damage, for which the insured is responsible, occurs." *Id.* at 4. It contended that the Berkley policy insuring Oxford expressly excludes Oxford's own work from coverage, the so-called Your Work exclusion. *Id.* at 4-5 (citing *id.* Attach. 8 *Commercial General Liability Aviation Insurance Policy* Coverage A—Bodily Injury and Property Damage Liability § 2(j)(6) (*Oxford Policy*)). Berkley further maintained that coverage for the bad paint job would be unavailable under the Hangarkeeper's Liability section of the policy. *Id.* (citing *Oxford Policy* Coverage D—Hangarkeepers' Liability § 2(e)). Finally, Berkley said that the bad paint job would not qualify as a "Loss" or "Occurrence" under the policy. *Id.* at 5 (citing policy definitions).

### 2. The Replacement Travel Claim

A second category of damages is Skilken's claim for replacement travel in the amount of $17,475.08; the amount Skilken paid for certain persons to fly on commercial aircraft while Skilken's Cessna was under repair. *Id.* at 6. Berkley contended that at least one of these trips was purely personal, namely, for Steve Skilken, President of Joseph Skilken & Company, to travel to St. Louis, Missouri to attend a diving meet for his daughters. *Id.* at 6-7. Berkley argued that the cost of this trip should be excluded because the cost did not represent damages to Skilken as a business and was not specific enough to be compensable. *Id.* at 7. In addition, Berkley isolated a trip to Dallas, Texas for which it maintains Skilken provided inadequate documentation. *Id.* Finally, Berkley objected to a trip to Milan, Italy on the ground that this trip is not sufficiently related to Skilken's business to be compensable under the Oxford policy. *Id.* at 7.

### 3. The Diminished Value Claim

Berkley disputed the $200,000 loss of value figure for the Cessna aircraft on three bases: (1) after the May 31, 2013 hard landing, Skilken agreed to a value of the Cessna equal to $1.6 million; (2) Skilken's valuations expert Wayne Muhler's methodology for arriving at the $200,000 diminished value figure was flawed because it did not account for actual sales figures of comparable aircraft; and (3) Wayne Muhler's valuation of the diminished value of the Cessna was flawed because the parties dispute the fair market value of the aircraft to begin with. *Id.* at 8-17.

### 4. The Reasonableness Standard

Finally, Berkley cited *Patrons Oxford Insurance Company v. Harris*, 2006 ME 72, 905 A.2d 819 and *Planalto v. Ohio Casualty Insurance Company*, No. 2:07-cv-00142-DBH, 2008 U.S. Dist. LEXIS 41036 (D. Me. 2008) for the proposition that an insurer is not liable for damages awarded in an uncontested default hearing if the damages are determined to be unreasonable. *Id.* at 17. Berkley acknowledged that *Harris* and *Planalto* place the burden to prove unreasonableness on different parties: *Harris* on the insured, and *Planalto* on the insurer. *Id.* But it said that *Harris* controls because it is a matter of state substantive law. *Id.* In total, Berkley urged the Court to find the $62,175.00 for repair of defective work uninsured, the replacement travel portion of $17,475.08 unrelated to Skilken's loss as a business, and the diminished value of the Cessna to equal $40,308 based on Berkley's expert's valuation. *Id.* at 18. Berkley asked the Court to reduce the damage award from $423,295.77 to $143,645.69. *Id.* at 19.

### B. Skilken's Response

#### 1. Waiver of Exclusions

In its response, Skilken acknowledged that a *Planalto* proceeding "allows an insurer to challenge the reasonableness of, in this case, damages awarded in a default judgment." *Pl.'s Opp'n* at 2 (quoting *Planalto*, 2008 U.S. Dist. LEXIS 41036, at *20-21). However, Skilken argued that, even though Berkley may contest the reasonableness of the damages, it may not now assert coverage defenses because Berkley may not "plead and prove a policy coverage exception which should have been brought, if at all, by counterclaim." *Id.* It explained that Maine law places a burden on the plaintiff in a reach and apply action to prove coverage under the insurer's policy, but it places a burden on the insurer to prove an exclusion to coverage. *Id.* (citing *Mut. Fire Ins. Co. v. Hancock*, 634 A.2d 1312, 1312-13 (Me. 1993)).

Skilken pointed out that in its March 15, 2017 decision on the cross-motions for summary judgment, the Court concluded that the Berkley policy was in effect when the hard landing occurred and that Berkley had sufficient notice of the Skilken claim to allow the policy to be reached. *Id.* at 3. Skilken conceded that when an insurer defends a civil action under a reservation of rights and the insured enters into a settlement without its consent, the insurer "is free to litigate the facts of coverage in a declaratory judgment action brought after the settlement is entered." *Id.* (quoting *Harris*, 2006 ME 72, ¶ 22, 905 A.2d 819). But Skilken contended that in order to raise a policy exclusion as a defense, an insurer must preserve the exclusion by filing a declaratory judgment action, by asserting a counterclaim in the reach and

apply action, or at a minimum by asserting the coverage exclusion as an affirmative defense in the reach and apply action. *Id.* (citing *Harris*, 2006 ME 72, ¶ 16, 905 A.2d 819; Fed. R. Civ. P. 13(a)(1)). Here, Skilken observed that Berkley refused Oxford's demands for a defense and for indemnification, and it asserts that "by doing so waived its right . . . to assert the policy exclusions it now argues." *Id.* at 4. It noted that Berkley did not file a counterclaim to the reach and apply action and did not raise coverage exclusions as an affirmative defense to the reach and apply action. *Id.*

Skilken speculated that Berkley may have "made an early strategic decision to go 'all or nothing'—to rely entirely on its dual arguments that the policy terminated before the hard landing and that even if the policy were in effect insufficient notice defeated reach and apply—rather than risk offering an additional argument which, while preserving policy exclusion defenses, might tacitly concede that the policy was in effect and notice sufficient." *Id.* In any event, Skilken claimed, Berkley is "bound by its choices." *Id.*

### 2. Burden of Proof on Insurer

Skilken disputed Berkley's contention that the burden to prove the reasonableness of the damages rests with Skilken. *Id.* at 4-6. It distinguished *Harris*, where the Maine Supreme Judicial Court was confronted with the appearance of collusion between the plaintiff and defendant in the underlying action and held that it was the plaintiff's burden to demonstrate that the settlement was "reasonable" and "nonfraudulent." *Id.* (quoting *Harris*, 2006 ME 72, ¶ 21, 905 A.2d 819). Here, by contrast, Skilken pointed out, the underlying judgment was judicially-awarded after

13

the entry of default and a damages hearing. *Id.* at 4-5. Skilken also noted that if Berkley had provided a defense as it was required to do under the Oxford policy, it would have been represented through insurance defense counsel at the damages hearing. *Id.* at 5. Skilken stated that the Court issued the underlying judgment only after receiving declarations and other proof and only after challenging certain elements of the damages claim, which Skilken withdrew. *Id.* Skilken argued that *Planalto* stated the proper rule for this case, namely that the insurer bears the burden to demonstrate the awarded damages are unreasonable. *Id.* at 5-6.

### 3. Judicial Determination of Berkley's Liability

Skilken quoted the Court's March 15, 2017 order, "[t]he Policy, if it was in effect at the time of the hard landing, would also have required [Berkley subsidiary] StarNet to indemnify Oxford for the claims set forth in the case of Joseph Skilken & Co. v. Oxford Aviation, Inc., 2:13-cv-00322-JAW." *Id.* at 6 (quoting *Summ. J. Order* at 8). Skilken stated that the Court's order did not "distinguish between losses which might have been covered under the policy and losses which the policy might have excluded from coverage." *Id.*

### 4. Equitable Estoppel and Berkley

Skilken next argued that Berkley should be equitably estopped from asserting policy exclusions against Skilken's reach and apply action. *Id.* at 6-9. Acknowledging that if an insurer defends an insured under a reservation of rights, the insurer does not breach its insurance agreement with its insured, Skilken noted "[t]hat's not what happened here." *Id.* at 6. Skilken asserted that Berkley "knew or is imputed to have

known that it had improperly terminated Oxford Aviation's policy, and it knew that Oxford Aviation had tendered to Berkley a deadly serious third party claim which, since the claim asserted an aircraft accident caused by Oxford Aviation's negligent work, had every appearance of being covered under the policy." *Id.* at 6-7. In sum, Skilken argued that "Berkley Aviation abandoned its insured." *Id.* at 7.

Skilken said that Berkley "was Oxford Aviation's fiduciary." *Id.* (citing *Tait v. Royal Ins. Co.*, 913 F. Supp. 621, 622 (D. Me. 1996)). Thus, Skilken maintained, Berkely had "an accompanying duty of good faith and fair dealing." *Id.* Skilken claims that instead of acting in good faith, Berkley made "an affirmative, knowing misrepresentation, on a critical point . . . to its fiduciary-insured." *Id.* In light of Berkley's breach of the duty of good faith and fair dealing, Skilken urged the Court to refuse to allow Berkley to invoke coverage defenses. *Id.* at 8. Skilken maintained that the Maine Supreme Judicial Court said as much in *Harris*. *Id.* at 8. Skilken argued that to rule otherwise would encourage insurers to "simply deny to its insured that the policy was in effect, hope the matter goes away, and if an eventual reach and apply action is successful, defend if possible on the basis that damages are subject to a policy exclusion." *Id.* Skilken observed that it has a "large judgment" against Oxford, and, if Berkley does not pay it, Skilken intends to pursue Oxford. *Id.* at 9.

### 5. Diminution in Value of the Skilken Aircraft

Skilken disagreed with Berkley's attack on the diminution in value claim. *Id.* at 9-10. Skilken observed that the claimed $200,000 diminution in value is corroborated by the sworn declaration of Wayne Muhler, Skilken's expert and a

person of experience in aircraft valuation. *Id.* at 9 (citing *id*. Attach. 1 *Decl. of Wayne Muhler*). Also, Mr. Skilken himself supported the $200,000 figure with his own sworn declaration. *Id.* (citing *id*. Attach. 2 *Decl. of Steve Skilken*). Skilken finally pointed to the Lane Aviation value opinion that was submitted in support of the application for default damages in the underlying action. *Joseph Skilken & Co. v. Oxford Aviation, Inc.*, No. 2:13-cv-00322-JAW, *Aff. of Steve Skilken*, Attach. 8 *Brad Willette, Lane Aviation Aircraft Sales, to Steve Skilken* (ECF No. 11) (*Willette E-mail*). Skilken urged the Court to accept the $200,000 figure.

## C.   Berkley's Reply

### 1.   The Replacement Travel Claim

In reply, Berkley first noted that Skilken did not respond to Berkley's concerns about Skilken's claims for reimbursement for personal travel. *Def.'s Reply* at 2. Berkley observed that Skilen "does not clarify its initial claims nor provide any distinction as to which expenses were personal to Mr. Skilken and his family (not parties to the litigation) and those that were properly incurred by the Plaintiff, J. Skilken & Co." *Id.* Instead, Berkley said that Skilken only asserted that the Court found these damages as a fact in the underlying litigation. *Id.* Berkley urged the Court to conclude that "Plaintiff is not entitled to claims for personal use by Steven Skilken and his family, and / or unspecified damages, and this claim must fail." *Id.*

### 2.   Berkley's Coverage Defenses: Timely and Preserved

Berkley contended that its coverage defenses are both timely and preserved. *Id.* at 2-4. Berkley first pointed out that Skilken agrees that "a *Planalto* proceeding

allows an insurer to challenge the reasonableness of damages awarded in default." *Id.* (citing *Pl.'s Opp'n* at 2; *Planalto*, 2008 U.S. Dist. LEXIS 41036).

Next, Berkley said that *Harris* controls Skilken's reach and apply action. *Id.* at 2-3 (citing *Harris*, 2006 ME 72, 905 A.2d 819). Berkley claimed that Skilken cannot meet its burden as to the repair damages ($67,175.00) because the reach and apply statute expressly excludes them if not covered by the policy, *id.* (quoting 24-A M.R.S. § 2903), and the policy excludes "this style of claim (e.g. consumer satisfaction)."

Regarding Skilken's claim that Berkley may not avoid its claim because Berkley failed to assert a counterclaim and therefore did not preserve its rights, Berkley stated that pursuant to the liberal "mistaken designation" provision of Federal Rule of Civil Procedure 8(c)(2), Berkley's affirmative defenses would suffice. *Id.* at 3. Here, Berkley pointed out that it asserted three affirmative defenses: (1) failure to state a claim upon which relief may be granted; (2) Skilken's lack of standing; and (3) Skilken's claims being barred under the contract between Oxford and Berkley. *Id.* (citing *Answer and Affirmative Defenses* at 2-3 (ECF No. 6)). Berkley also observed that it raised these issues in its motion for summary judgment. *Id.* at 3-4. Berkley complained that "had Berkley had an opportunity to appear at the initial damages hearing as between J. Skilken and Oxford Aviation, it would have been entitled to assert that 'customer satisfaction' was not a covered loss under the Policy." *Id.* at 4.

Finally on this point, Berkley argued that the Court's order for a reasonableness hearing confirms that, just because the Court found the Berkley

policy that insured Oxford was in effect on the date of the accident, does not mean that all damages awarded in the judgment against Oxford are necessarily reasonable. *Id.*

### 3. Steven Skilken's Statement of Valuation

Skilken attached to its opposition a sworn declaration from Steven Skilken, who opined that the $200,000 diminution in value figure is "correct, or perhaps somewhat low." *Pl.'s Opp'n* Attach. 2 (*Decl. of Steven Skilken* ¶ 9). Berkley conceded that the law allows an owner of property to testify as to its value, but it stressed that Mr. Skilken is not the owner of the Conquest II in this case; Joseph Skilken & Co. is the owner. *Def.'s Reply* at 4-5. Berkley said that the Court should not accept Mr. Skilken's statement of value because, in its view, Mr. Skilken did not properly explain the bases for his opinion to qualify himself as an expert. *Id.* at 5-6. Berkley also argued that Mr. Skilken's assignment of value to the aircraft is unrealistic given the market trends for similar aircraft. *Id.* at 6.

### 4. Lane Aviation's Statement of Value

Responding to Skilken's argument that its three valuation opinions are better than Berkley's one, Berkley replied that this "argues quantity over quality." *Id.* at 6. Berkley said that the Lane Aviation statement on diminution in value should be disregarded. *Id.* at 6-7.

### 5. Summary

Berkley reiterates its request that the Court issue an award of damages to Joseph Skilken & Co. in the amount of $143,645.69. *Id.* at 7.

**D.     Skilken's Sur-reply**

In its sur-reply, Skilken points out that in its answers to interrogatories dated January 8, 2016, Berkely did not assert any coverage defenses.  *Pl.'s Sur-reply* at 1-2.

**E.     Skilken's Additional Brief**

**1.     "Bad Paint Job" Damages**

Skilken stated that after inquiring with West Star Aviation, the shop that did the paint job to repair the Conquest II after the hard landing, West Star informed Skilken that it "did not separately break out the costs of the painting associated with the repairs to the aircraft skin, in the area of the fuel leaks and so forth." *Pl.'s Add'l Br.* at 1-2.  Instead, the shop e-mailed Skilken's counsel on June 19, 2017: "It looks like all the paint work was no charged." *Id.* at 2.  Skilken pointed out that "[n]o aviation shop gives away time or materials." *Id.* at 2.  Although counsel for Skilken expressed "no doubt" that "the cost of the paint work is reflected in the West[ S]tar invoice," he could "only provide the court with the facts as we are given to understand them." *Id.*

**2.     Reservation of Rights Letter**

Skilken also addressed Berkley's failure to send a reservation of rights letter to Oxford once Berkley became aware of the underlying lawsuit.  *Id.* at 2.  Skilken noted that under Maine law, an insurer is obligated to tell its insured whether it affirms coverage, denies coverage, or agrees to defend but reserves its right to assert coverage defenses.  *Id.* (quoting 24-A M.R.S. § 2436-A(1)(D)).  However, Skilken

maintained that Berkley never sent a reservation of rights letter to Oxford and never investigated the matter. *Id.*

In Skilken's view, Berkley's "failure to send a reservation of rights letter prevents it from now asserting a policy exclusion as a defense to a reach and apply action." *Id.* at 3. Skilken quotes Appleman on Insurance to the effect that "if the liability insurer simply denies coverage, but is subsequently found to have wrongfully done so, the insurer . . . will be estopped from alleging and establishing that the claim falls within a policy exclusion." *Id.* (quoting APPLEMAN ON INS. LAW AND PRACTICE ARCHIVE § 8.4). Skilken described the position in Appleman as "the prevailing position." *Id.* at 3-5 (citing cases). Here, Skilken, argued Berkley's conduct is particularly egregious because Berkley did not merely deny a defense, it "essentially walked away from its insured." *Id.* at 5. In these circumstances, Skilken maintained that "Berkley is liable for the entire judgment reached below, including damages which, had Berkley defended Oxford Aviation under a reservation of rights, would likely have been excluded from coverage." *Id.* at 6.

### F.     Berkley's Additional Responsive Brief

#### 1.     Bad Paint Job

Berkley viewed Skilken's additional brief as a concession that the alleged "bad paint job" is not related to the hard landing. *Def.'s Addt'l Opp'n* at 1. Berkley also said that Skilken conceded there was no charge for the paint work following the hard landing. *Id.* In effect, Berkley argued Skilken has admitted the "bad paint job"

damages of $62,175.00 were not causally connected to the hard landing, a fact that Berkley said was discovered only at Mr. Skilken's deposition in this case. *Id.* at 2.

Berkley reiterated its contention that damages due to faulty workmanship is not covered under its insurance policy with Oxford and therefore would not be recoverable under 24-A M.R.S. § 2904. *Id.* It pressed its argument that "[Skilken's] claims for damages against Berkley related only to the alleged negligence of Oxford Aviation for having 'neglected properly to reattach a certain part of the aircraft's tail' and that [t]he Hard Landing proximately caused damages to plaintiffs." *Id.* at 3 (quoting *First Am. Compl.* ¶¶ 6, 13 (ECF No. 18)).

### 2. Reservation of Rights

Berkley argued that it was never informed before this lawsuit that bad paint job damages were being asserted as a consequence of the hard landing. *Id.* at 3. Berkley was made aware of only potential damages resulting from the hard landing, not damages due to Oxford's faulty workmanship. *Id.* (citing Attach. A, *Letter from Bruce A. Lampert, Esq. to James Horowitz* (Jun. 6, 2013), *Letter from John S. Hoff to Naji Malek* (Jun. 24, 2013)).

Berkley disputed Skilken's proposition that an insurer which does not defend an underlying action under a reservation of rights waives the right to assert policy defenses to a later reach and apply action. *Id.* Berkley said that even though other jurisdictions may have adopted this proposition, "it is in fact contrary to established Maine law." *Id.*

Berkley wrote that in Maine, "claims administration is not a waiver." *Id.* Berkley stated that 24-A M.R.S. § 2424 provides that if an insurer "acknowledges receipt of a loss, as happened here, or if it investigates a loss or engages in any negotiations looking toward settlement of a loss, those actions do <u>not</u> constitute a waiver of any provision of the policy or any defense of the insurance under a policy." *Id.* at 3-4 (emphasis in original). Berkley argued that it comes within the protection of § 2424 by acknowledging receipt of the loss and by performing an investigation. *Id.* at 4. Berkley contended that its request for further information constitutes an investigation within the meaning of § 2424, even though that information was never provided. *Id.* In fact, Berkley stated that "an insured may not use the doctrine of waiver in order to create insurance coverage where none existed before." *Id.* (citing *Kraul v. Me. Bonding & Cas. Co.*, 559 A.2d 338 (Me. 1989)).

Next, Berkley maintained that the Maine Supreme Judicial Court ruled on this very issue in *Auburn Water District v. Insurance Company of North America*, 312 A.2d 174 (Me. 1973). Berkley said under *Auburn Water*, because a waiver is a "voluntary relinquishment of a known right," a simple denial of liability on the part of an insurer does not constitute a waiver of policy defenses. *Id.* at 4-5 (quoting *Auburn Water*, 312 A.2d at 176). Berkley stressed that this result is particularly appropriate here because it did not become aware of possible policy exclusions until litigation was well underway. *Id.* at 5.

Berkley turned to equitable estoppel. *Id.* at 5-6. Here, Berkley contended it did or omitted nothing that misled either Skilken or Oxford to their prejudice, and

therefore equitable estoppel, which in Berkely's view requires detrimental reliance, does not apply. *Id.* at 5-6.

### G. Skilken's Reply

#### 1. 24-A M.R.S. § 2424

Skilken responded that § 2424 is no help to Berkley because it is directed to "routine claims administration" and here Berkley "completely failed to administer the claim." *Pl.'s Addt'l Reply* at 1. Skilken argued that Berkley "wrongfully told Oxford that the policy terminated two weeks before the hard landing, . . . never corrected that assertion, . . . breached its obligation to investigate the Skilken claim, and . . . never even sent its insured a denial of coverage or a reservation of rights letter." *Id.* All of which, Skilken contended, "led directly and predictably to the underlying judgment entering without Berkley's input." *Id.* In these circumstances, Skilken claimed, "any reasonable person [would] recognize the detrimental reliance absent from [*Elliott*] *v. Hanover*, 1998 ME 138[, 711 A.2d 1310]." *Id.* at 2-3.

#### 2. Estoppel

Skilken argued that Berkley did in fact mislead its insured by informing Oxford that its policy had been terminated two weeks before the hard landing, when in fact the policy was still in effect. *Id.* at 2. Skilken urged the Court to conclude that Berkley had a duty to tell Oxford that, in truth, the policy was in effect on the date of the hard landing. *Id.*

#### 3. Waiver

Skilken reiterated its view that by failing to administer the Skilken claim, Berkley waived its right to assert policy defenses. *Id.* at 3-4. Skilken wrote:

> The law imputes in Berkley the knowledge that it had both the right and duty to administer the Skilken claim against Oxford Aviation: the right and duty to acknowledge the claim, to investigate the claim, to either expressly deny coverage if it thought the policy allowed it that right, or to defend and indemnify in accordance with the policy, either without reservation or expressly reserving its rights by reservation of rights letter.

*Id.* at 3-4. Skilken contended that "Berkley's knowing abandonment of its right to defend and indemnify its insured under an express reservation of rights is most certainly Berkley's knowing waiver of that right." *Id.* at 4.

## III. DISCUSSION

### A. Maine's Reach and Apply Statute: 24-A M.R.S. § 2904: An Overview

Maine's reach and apply statute reads in the pertinent part:

> Whenever any person . . . recovers a final judgment against any other person for any loss or damage specified in section 2093, the judgment creditor shall be entitled to have the insurance money applied to the satisfaction of the judgment by bringing a civil action, in his own name, against the insurer to reach and apply the insurance money, if when the right of action accrued, the judgment debtor was insured against such liability, and if before the recovery of the judgment the insurer had had notice of such accident . . . or damage. The insurer shall have the right to invoke the defenses described in this section in the proceedings.

24-A M.R.S. § 2904. As the Maine Supreme Judicial Court has explained, the reach and apply statute "provides a cause of action to a person who recovers a final judgment against the judgment debtor to reach and apply insurance coverage to satisfy the judgment if (1) the judgment debtor was insured against such liability when the right of action accrued; and (2) the insurer was given notice of such accident,

injury, or damage before the recovery of the judgment." *Sarah G. v. Me. Bonding & Casualty Co.*, 2005 ME 13, ¶ 6, 866 A.2d 835 (citing *Marston v. Merchs. Mut. Ins. Co.*, 319 A.2d 111, 113 (Me. 1974); *see Hawkesworth v. Nationwide Mut. Ins. Co.*, No. 2:10-cv-232-GZS, 2011 U.S. Dist. LEXIS 66016, at *14 (D. Me. Jun. 21, 2011). Here, the record confirms that Berkley was given notice of the accident before the recovery of the underlying judgment, and therefore there is no issue as to the second prong.

Turning to the first prong ("if . . . the judgment debtor was insured against such liability"), "the burden is on the plaintiff in a reach and apply action to establish coverage. It is then the insurer's burden to establish that the claim is subject to a policy exclusion." *Hawkesworth*, 2011 U.S. Dist. LEXIS 66016, at *14-15 (citing *Harris*, 2006 ME 72, ¶ 18 n.6, 905 A.2d 819 (citing *Hancock*, 634 A.2d at 1312-13)); *see City of S. Portland v. Me. Mun. Ass'n Prop. & Cas. Pool*, 2017 ME 57, ¶ 7, 158 A.3d 11 ("The insurer has the burden to establish that an exclusion applies").

Finally, as to damages, "[i]f the preponderance of evidence at trial establishes that at least some of the underlying property damage is subject to coverage, [an insurer] has very limited defenses." *Hawkesworth*, 2011 U.S. Dist. LEXIS 66016, at *24. "The only defenses to a reach and apply action are those contained in section 2904." *Harris*, 2006 ME 72, ¶ 21, 905 A.2d 819; *Hunnewell v. Liberty Mut. Fire Ins. Co.*, 588 A.2d 300, 302 (Me. 1991) ("Once coverage has been established, the statute lists six defenses the insurer may raise to challenge its obligation to pay the judgment. These six defenses are the only ones that may be raised by the insurer in a reach and apply action").

Under Maine law, "once coverage is found to exist for at least a portion of an unallocated damage award, Defendant is left to defend by showing that the settlement reflects fraud, collusion or is otherwise unfair and unreasonable." *Hawkesworth*, 2011 U.S. Dist. LEXIS 66016, at \*24. Thus, "[i]f the insurer prevails on the coverage issue, it is not liable on the settlement. If the insurer does not prevail as to coverage, it may be bound by the settlement, provided the settlement, including the amount of damages, is shown to be fair and reasonable, and free from fraud and collusion." *Harris*, 2006 ME 72, ¶ 22, 905 A.2d 819.

## B.  Waiver and Estoppel: Coverage Defenses and Exclusions

Skilken makes several policy arguments in favor of its position that if an insurer fails to defend an insured under a reservation of rights, the insurer has thereby waived or is estopped from asserting coverage defenses to a later reach and apply action. In discussing § 2904, the Maine Supreme Judicial Court has typically been careful to note whenever an insurer defended an insured under a reservation of rights. *See, e.g., Harris*, 2006 ME 72, ¶ 4, 905 A.2d 819 ("Patrons sent a letter to Harris, informing him that it was providing him with counsel, but that this representation was subject to a reservation of rights . . . ").

Nevertheless, § 2904 does not contain an exception for those insurers who fail to defend the underlying action under a reservation of rights as opposed to those who deny coverage altogether. By its language, the statute requires that the insured be "insured against such liability." 24-A M.R.S. § 2904. The Maine Supreme Judicial Court has reiterated that a condition of a successful reach and apply action is

26

coverage. *Knight v. Me. Mut. Fire Ins. Co.*, 651 A.2d 838, 839 (Me. 1994) ("The reach and apply statute requires both a notice and coverage in order for a judgment creditor to have insurance money applied to satisfy a judgment"); *Hunnewell*, 588 A.2d at 302 ("Under the statute, the insured must first establish coverage").

Under Maine law, a refusal to defend does not preclude an insurer from defending a reach and apply action on the basis of lack of coverage. In *Sarah G.*, two minors successfully sued the owners of a motel and their motel corporation alleging that one of the owners had sexually exploited them in the motel. *Sarah G.*, 2005 ME 13 ¶¶ 2-4, 866 A.2d 835. The insurer that had issued a commercial general liability policy to the motel business was notified of the personal injury action but refused to provide a defense. *Id.* ¶ 3. In *Sarah G.*, the Maine Supreme Judicial Court allowed the insurer to assert a coverage defense to a stipulated judgment against the owners and the motel corporation, and affirmed a judgment in favor of the insurer. *Id.* ¶ 13 ("Because none of the claims forming the basis of the judgment are covered by the policy, Sarah and Bianca cannot recover the judgment from the insurers in the reach and apply action").

Similarly, in *Aridas v. Royal Insurance Company of North America*, 462 F. Supp. 2d 76 (D. Me. 2006), the District of Maine decided a reach and apply action in favor of the insurer on the basis of a coverage exclusion where the insurer refused to provide a defense to a putative insured. *Id.* at 76 ("I conclude that the insurance policy does not cover the damages"); *see also Marston*, 319 A.2d at 113-15 (no coverage found in a reach and apply action despite no defense being afforded by the insurer).

In *Elliott*, the Maine Supreme Judicial Court considered and rejected an argument like the one Skilken is asserting. *Elliott*, 1998 ME 138, 711 A.2d 1310. In *Elliott*, after being informed of an injury to someone who was on the insured's property, the insurer denied coverage. *Id*. at ¶ 4. The injured person and the insured then agreed that the insured would not defend a personal injury case and in exchange, the injured party agreed not to pursue the insured personally for damages. *Id*. The insured further agreed to assign his rights under the policy to the injured party. *Id*. In a subsequent reach and apply action, the injured party argued that the insurer must be precluded from asserting the defense of noncoverage, but the Maine Supreme Judicial Court rejected the argument. *Id*. ¶¶ 9-11. The *Elliott* Court wrote "[b]y finding the insurer has a duty to indemnify as a penalty for refusing to defend, even if no coverage exists, the court [would] improperly enlarge[] the bargained-for coverage." *Id*. ¶ 11 (quoting *Servants of Paraclete, Inc. v. Great Am. Ins. Co.*, 857 F. Supp. 822 (D.N.M. 1994)).

Finally, in *Edwards v. Lexington Insurance Company*, 507 F.3d 35 (1st Cir. 2007), the First Circuit noted that the Maine Supreme Judicial Court rejected the type of estoppel claims that Skilken is pressing here: "An insurer that breaches its duty to defend . . . is not estopped from asserting noncoverage as a defense in a subsequent action brought by the insured or the insured's assignee." *Id*. at 40 (quoting *Elliott*, 1998 ME 138, ¶ 11, 711 A.2d 1310); *see also Bucci v. Essex Ins. Co.*, 393 F.3d 285, 292-95 (1st Cir. 2005).

The parties have not directed the Court to any court decision that addresses the precise circumstance presented here, namely where the insurer has not merely refused to provide a defense but also failed to provide the insured with a reservation of rights letter and coverage was later established. But there is nothing in the language of the statute nor the caselaw that would bar the insurer from asserting that the claimed damages are not covered under the terms of the insurance policy. To rule otherwise would create insurance coverage where none existed under the policy. *See Kraul*, 559 A.2d at 338 ("[T]he plaintiff is seeking to *create* a contractual provision of coverage") (emphasis in original); *Bucci*, 393 F.3d at 294 (1st Cir. 2005) ("[A] court will not create coverage in those situations where coverage does not exist") (citation omitted).

### C. Coverage Defenses

In *Elliott*, the Maine Supreme Judicial Court described the penalty that applies to an insurer that breaches the duty to defend: "The insurer, however, has the burden of proving that the claim was not within the policy's coverage when it wrongfully declines to defend a claim." *Elliott*, 1998 ME 138, ¶ 11, 711 A.2d 1310. Therefore, under *Elliott*, unlike the typical situation where Skilken would bear the burden to prove coverage and Berkley to prove exclusion, because Berkley wrongfully refused to defend Oxford, Berkley bears the entire burden of demonstrating an absence of coverage under the Oxford policy.

Here, Berkley asserts two policy defenses to the Skilken damages claim: the Your Work exclusion to bad paint job, and the absence of coverage under the business policy for travel expenses for personal use.

### D.     Oxford's Paint Job

In its underlying lawsuit, in addition to the claims that Skilken made about the hard landing, Skilken also brought straightforward claims against Oxford concerning an allegedly bad paint job. *Joseph Skilken & Co. v. Oxford Aviation, Inc.*, No. 2:13-cv-00322-JAW, *Compl.* (ECF No. 1).

Regarding the bad paint job, Berkley contends that coverage for Oxford's own work is excluded under § 2(j)(6) of the Oxford policy:

> **Exclusions.**  This insurance does not apply to:
> (j) **Property damage** to:
> (6) That particular part of any property that must be restored, repaired or replaced because **your work** was incorrectly performed on it.

*Oxford Policy* at Coverage A—Bodily Injury and Property Damage Liability § 2(j)(6) (emphasis in original).  Section V of the policy defines "your work":

> **Your Work**
> (a) Means:
> (1) Work or operations performed by you or on your behalf; and
> (2) Materials, parts or equipment furnished in connection with such work or operation.
>
> **Your Work**
> (b) Includes:
> (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your work**; and
> (2) The providing or failure to provide warnings or instructions.

*Id.* at § V(21) (emphasis in original). Berkley also points out that the bad paint job would be excluded from coverage under the Hangarkeeper's Liability section of the policy. *Def.'s Mot.* at 5.

Turning back to Skilken's underlying claim, during the damages phase of the motion for default judgment, Skilken presented the affidavit of Steve Skilken, the President of Joseph Skilken & Co., in support of the claimed damages. *Joseph Skilken & Co. v. Oxford Aviation, Inc.*, No. 2:13-cv-00322-JAW, *Aff. of Steve Skilken* (ECF No. 11). Regarding the bad paint job damages, Mr. Skilken stated:

> 8. Defendant made numerous statements to me concerning the quality of the work to be provided by Defendant, including among other things, that the work would be performed properly and in a first rate manner. After initially failing to correctly perform the services contracted for, the Defendant informed me that all work was performed properly, and that the Defendant will be able to deliver [the Cessna] with all issues addressed. I relied on those representations provided by the Defendant in agreeing to utilize Defendant's services and in initially accepting Defendant's work. I now believe that the Defendant falsely represented to me that all of its work on the Cessna would be and was performed properly and that it would deliver the plane with all issues addressed.
>
> 11. As a direct and proximate result of Defendant's breaches, negligence, actions and misrepresentations, the Skilken Company suffered the following damage and pecuniary harm:
>
> b. the cost of repairing Defendant's defective work totaling $62,175.00 (see proposal from West Star attached as Exhibit B)

*Id.* ¶ 11. Exhibit B from West Star contained an estimate of $62,175.00 for "Custom Paint Refurbishment." *Id.* Attach. 2 (*West Star Aviation Estimate*).

The fact that the Court determined in *Joseph Skilken & Co. v. Oxford Aviation, Inc.* that Oxford breached its contract with and its warranties to Joseph Skilken & Co. does not mean that these damages were insured under Oxford's insurance policy

with Berkley. In fact, a direct review of the bad paint job damages and a comparison with the policy exclusions compels the conclusion that the bad paint job damages were not covered under the Berkley policy.[3] Although Skilken argues that the paint job should be covered under waiver and estoppel theories, Skilken never argues that the cost of refurbishing the Oxford paint job would be covered under the language of the insurance contract. The Court's conclusion is buttressed by the inability of Skilken to demonstrate that any of the paint job estimate was related to the hard landing. Therefore, the Court does not include the $62,175.00 paint job damages in its award in this case.

### E.   Replacement Travel Costs

Unlike the claim for the bad paint job, Skilken's claim for travel expenses caused by the hard landing is potentially covered under the Oxford policy. However, if the travel expenses were for personal, as opposed to business, reasons, the expense would not be covered under the policy. Turning back to the allegations in the Complaint in the underlying action, Skilken specified that it had been "unable to utilize the Cessna for its business purposes, and this result was at all times reasonably foreseeable to Defendant." *Joseph Skilken & Co. v. Oxford Aviation, Inc.*, *Compl.* ¶ 18.

In his affidavit in support of Skilken's damages, Steve Skilken stated:

---

[3]      In drawing this conclusion, the Court is aware of *Oxford Aviation, Inc. v. Global Aerospace, Inc.*, 680 F.3d 85 (1st Cir. 2012), where the First Circuit concluded that Oxford's insurer in that case could not escape its duty to defend under the "Your Work" exclusion. But "[t]he duty to defend is broader than the duty to indemnify." *Mitchell v. Allstate Ins. Co.*, 2011 ME 133, ¶ 10, 36 A.3d 876.

> 11. As a direct and proximate result of Defendant's breaches, negligence, actions and misrepresentations, the Skilken Company suffered the following damage and pecuniary harm:
>
> f. the cost of utilizing commercial aircraft while the Cessna was being repaired totaling $17,475.08 (see bills and credit card statements reflecting the same attached as Exhibit E).

Exhibit E is an account summary of Steve Skilken's personal credit card, which reflects charges for airfare, flight insurance, and baggage insurance for various trips. *Joseph Skilken & Co. v. Oxford Aviation, Inc.*, No. 2:13-cv-00322-JAW, *Additional Attachs.* (ECF No. 12) (*Credit Card Records*).

When the Court issued its November 15, 2013 order on Motion for Default Judgment, it noted that Skilken was claiming, among other things, "[r]eplacement travel during the period the Cessna was unavailable due to repairs in the amount of $17,475.08." *Order* at 5. In its order, the Court accepted Mr. Skilken's affidavit in which he represented that the $17,475.08 was for business, not personal travel. *Id.* at 6 ("The remaining damages claims are in order").

### 1. Claims of Personal Use Under *Elliot*

Berkley states that some of the travel expenses claimed by Skilken as business trips were in fact for personal use. The *Elliott* case, however, precludes Berkley from contesting in this reach and apply action facts that could have been litigated in the underlying case, had it defended Oxford. In the words of the *Elliott* Court: "[The insurer] is also bound by the default judgment as to any factual issues that might have been litigated in the underlying negligence action." *Elliott*, 1998 ME 138, ¶ 11, 711 A.2d 1310. The *Elliott* Court cited *Marston* with respect to this issue:

It is [also] well established that an insurer who had reasonable notice of the pendency of an action by the injured person against the insured and was requested to assume its defense but declined to do so electing to disclaim coverage, is bound by the judgment in that action as to issues which were or might have been litigated therein in a subsequent suit by the injured person for recourse to the policy.

*Id.* at ¶ 9 (citing *Marston*, 319 A.3d at 114).

As *Bucci* explained, under Maine law, a default judgment has a "limited preclusive effect." *Bucci*, 393 F.3d at 296. The First Circuit noted that in *Elliott*, the Maine Supreme Judicial Court "limited the binding effect of the default judgment to issues which were or 'might have been litigated' in the underlying action by the injured person for recourse to the policy." *Id.* at 295 (quoting *Elliott*, 1998 ME 138, ¶ 11, 711 A.2d 1310). The *Bucci* Court viewed this language in *Elliott* as likely limited by the rule in *American Policyholders' Insurance Company v. Cumberland Cold Storage Company*, 373 A.2d 247 (Me. 1977), "that where there is a duty to defend, 'the indemnification obligation *depends upon the theory under which the judgment is entered* in the underlying damages action.'" *Bucci*, 393 F.3d at 295 (quoting *Am. Policyholders'*, 373 A.2d at 251) (emphasis supplied in *Bucci*). In addition, the *Bucci* Court stated that it did not understand Maine law "to depart from the usual rule that any binding effect from an underlying judgment is only as to facts which were essential to the underlying judgment." *Id.*

Applying *Elliott* as illuminated by *Bucci*, the theory under which Skilken was proceeding in the underlying action against Oxford was that Oxford's negligence in failing to secure the fin tail caused the hard landing, which in turn caused Skilken's Cessna to be out of commission for a period of time, necessitating Skilken's use of

commercial airlines for its business travel. Here, the Court concludes that whether some of the travel expenses that Skilken claimed in the underlying litigation as business-related were in fact for personal use would have been a factual issue that could have been and was litigated in the underlying action. In fact, Berkley was able to identify this issue during its discovery in this reach and apply action and to question Mr. Skilken about the travel expense claim. If Berkley had chosen to defend Oxford in the underlying action, the Court finds that defense counsel hired by Berkley to represent Oxford could easily have raised the same factual issue Berkley now belatedly attempts to raise in this reach and apply action. It is too late. Under *Elliott*, Berkley is precluded from claiming an absence of coverage for travel expenses based on asserted personal use.

## 2. Reasonableness under *Planalto*

Berkley has another arrow in its quiver. The Court turns to *Planalto*. In 2008, the District of Maine considered the scope of *Elliott*, which was decided in 1998, in light of the *Harris*, which was decided in 2006. The *Planalto* Court concluded that "the defendant [insurer] is not bound by the determination of damages made by the state court, if it can show that the damages judgment was unreasonable." 2008 U.S. Dist. LEXIS 41036, at *27. The *Planalto* Court went on: "It is important to note at this juncture that what *Harris* compels here is not, strictly speaking, a relitigation of the issue of damages. Rather, the burden is on the insurer who declined to participate below to prove that the damages awarded below were unreasonable." *Id.* The Court observed that "[t]he fact that the state trial court determined the amount

of damages in the underlying action in the instant case certainly makes that amount appear to be more objectively reliable than an amount determined by settlement, but still, only one side of that particular damages issue was presented to the court." *Id.* at *28. Under *Planalto*, therefore, the question narrows to whether Berkley has demonstrated that the damages awards for replacement travel are "unreasonable."

### a. The Reasonableness of the Replacement Travel Award

As noted earlier, in *Joseph Skilken & Co. v. Oxford Aviation, Inc.*, the Court awarded $17,475.08 in travel expenses to Joseph Skilken & Company based on Mr. Skilken's affidavit, as President of Joseph Skilken & Company, that the travel expenses were business expenses necessitated by the fact that the Skilken company Cessna was being repaired. The $17,475.08 figure was derived from an exhibit admitted into evidence at the damages hearing detailing payments for commercial airfare as well as associated flight and baggage insurance premiums. *Credit Card Records*.

During his deposition, Mr. Skilken recalled that one of the trips that, as President of Joseph Skilken & Company, he submitted to the Court as a business expense was a trip from Columbus, Ohio to St. Louis, Missouri for a diving meet for his children who are competitive athletes. *Def.'s Mot.* Attach. 7, *Dep. of Steve Skilken* at 62:10-63:3; 65:12-24. Mr. Skilken testified that the trip to St. Louis to attend his children's diving meet was a business expense because "[t]hey are heirs to the

company."[4]  *Id.* 65:16-66:2.  He further justified treating the diving meet trip as a business expense because "[e]verything I do is part of Joe Skilken Company."  *Id.* 66:3-7.  The Court soundly rejects Mr. Skilken's unorthodox view of a proper business expense as entirely unreasonable.  If the Court had known about the nature of the St. Louis trip at the time of the default damages hearing, it would not have awarded the travel expenses associated with the trip as proper business expenses for Joseph Skilken & Company.

While Mr. Skilken's patently unreasonable rationale for claiming the St. Louis trip as a business expense makes the Court skeptical as to the legitimate business relatedness of the other trips claimed, Berkley has failed to produce sufficient specific evidence to prove that the others were personal in nature or otherwise unreasonable.  Mr. Skilken testified that a trip to Dallas "was to visit a site that's being developed by Berkshire Hathaway that I was consulting on."  *Id.* 63:19-25.  With respect to a trip to Milan, Italy, he testified that the business partner with whom he owns a bank in Melbourne, Florida wanted to meet in Milan "to discuss the bank and to spend time with him."  *Id.* at 64:7-65:11.  The record includes a claimed expense for a trip to Minneapolis.  The excerpts of Mr. Skilken's deposition do not speak to this trip in particular.  The Court is willing to accept travel costs associated with these trips as reasonable business expenses as to Steve Skilken in his role as president of Joseph Skilken & Company.

---

[4]      However, in another portion of his testimony, Mr. Skilken seems to admit the personal nature of the trip.  *Id.* at 62:10-63:3.  Of course, personal trips cannot be properly claimed or awarded as business expense damages.

Berkley fails to produce specific evidence disputing the asserted business purposes of these trips. Instead it uses the St. Louis trip as a predicate to state that Skilken "does not clarify its initial claims nor provide any distinction as to which expenses were personal to Mr. Skilken and his family (not parties to this litigation) and those that were properly incurred by Plaintiff J. Skilken & Co." *Def.'s Reply* at 2. Berkley also challenges the damages as being insufficiently specific, suggesting that Skilken must prove them to a reasonable certainty. *Def.'s Mot.* at 7. Berkley misapprehends the burden and the standard at this juncture. "[T]he burden is on the insurer who declined to participate below to prove that the damages awarded below were unreasonable." *Planalto*, 2008 U.S. Dist. LEXIS 41036, at *27. Casting doubt upon the damages is not the same is proving their unreasonableness.

The record reflects that Karen Skilken is Steve Skilken's wife, and the record is devoid of evidence that she has any role in Joseph Skilken & Company. The record reflects airfare purchased for Blake and Jordan Skilken, in addition to Karen and Steve Skilken, for the St. Louis diving trip. *Credit Card Records* at 7-10. Given Mr. Skilken's testimony that the purpose of this trip was for his children's diving meet, the Court infers that Blake and Jordan are his children. The Court notes that the record in the underlying litigation bolsters this inference. In one of its filings, Skilken's counsel represented that Steve and Karen Skilken's daughters were aboard the Cessna for the "hard landing" flight at Colorado Springs. *Joseph Skilken & Co. v. Oxford Aviation, Inc.*, No. 2:13-cv-00322-JAW, *Pls.' Mot. for Summ. J.* at 4 (ECF No. 39) ("The next day, with Mr. Skilken in command, he, his wife Karen Skilken,

their two daughters, and Mrs. Skilken's mother and father departed Columbus for Colorado Springs"). The credit card records show the purchase of one-way airfare from Denver, Colorado to Columbus, Ohio four days after the hard landing in Colorado Springs, Colorado for Steve, Karen, Blake, and Jordan Skilken. This is consistent with the family traveling home to Ohio via a commercial airline following their personal aircraft being rendered temporarily inoperable. *Credit Card Records* at 7-10. The record reveals no indication that either Blake or Jordan Skilken have any role in Joseph Skilken & Company other than as heirs.

There is no record evidence that Karen, Blake, and Jordan Skilken have any role in the Joseph Skilken & Company business. In assessing this issue, the Court applies a variant of Occam's razor, namely, if there are two possible explanations, the simpler is usually the true one. Based on Mr. Skilken's convoluted response to how trips by members of his family could be considered business expenses, the Court infers that Karen, Blake, and Jordan Skilken did not have an active role in Joseph Skilken & Company, because if they had been actively involved, Mr. Skilken would have said they were. Pursuant to *Planalto*, the Court concludes that Berkley has demonstrated that costs associated with Karen, Blake, and Jordan Skilken's travel and with Steve Skilken's travel to St. Louis—totaling $10,701.22—are unreasonable. Thus, the Court deducts that amount from the damages award. However, due to Berkley's failure to sustain its burden of proving the unreasonableness of any other part of the original $17,475.08 award for damages associated with replacement travel costs, the Court concludes that the remaining $6,773.86 is reasonable.

### F.   The Diminution in Value Claim

In its default order, the Court determined that the diminution in the value of the Cessna was equal to $200,000. *Joseph Skilken & Co. v. Oxford Aviation, Inc.*, *Am. Order* at 5-7. The Court based this conclusion on Mr. Skilken's affidavit together with an appraisal report submitted by Brad Willette, Aircraft Sales Manager, Lane Aviation. *Id.* Mr. Skilken attached to his affidavit an e-mail from Brad Willette, Aircraft Sales Manager, dated October 10, 2013, in which Mr. Willette confirmed that he had appraised Skilken's 1980 Cessna Conquest II. *Willette E-mail.* Mr. Willette opined that the aircraft lost fifteen percent of its value due to the hard landing, that the fair market value of a similar undamaged aircraft would be $1,450,000, and therefore that the diminution in value was $200,000. *Id.*

#### 1.   Diminution in Value Under *Elliott*

With respect to Berkley's rankling at the $200,000 figure, the Court is required to apply *Elliott*. The question is whether the factual issues that Berkley now presents "could have been litigated in the underlying negligence action." *Elliott*, 1998 ME 138, ¶ 11, 711 A.2d 1310. It seems plain that Mr. Willette's qualifications, the bases for his opinion, the presentation of alternative experts with other opinions could all have been thoroughly litigated in the underlying action. Therefore, under *Elliott*, the Court cannot consider those bases to support  Berkley's challenge to the $200,000 diminution in value figure.

#### 2.   The Reasonableness of the Diminution in Value Award

The Court turns to reasonableness under *Planalto*. In its attack against the $200,000 diminution in value figure, Berkley contends that (1) the Cessna's value was not diminished at all, (2) Skilken's expert Wayne Muhler's valuation methodology in arriving at his opinion of the fair market value of the Cessna is flawed, and (3) Mr. Muhler's valuation methodology in arriving at his opinion that the diminution in value was $213,037.50 is also flawed. *Def.'s Mot.* at 8. Berkley contends that the true figure for diminution in value is $40,308. *Id.* at 16. Skilken responds that the $200,000 diminution in value figure awarded is supported by Mr. Willette's appraisal, Mr. Muhler's declaration, and by Mr. Skilken himself. *Pl.'s Opp'n* at 9.

Unlike Berkley's challenge to the replacement travel expenses, the Court concludes that the $200,000 diminution in value figure is reasonable. Originally based on the opinion of a person employed by an aviation company, the figure has been buttressed by Mr. Muhler and by Mr. Skilken. Berkley's attempts to discredit these opinions are, in the Court's view, an attempt to relitigate what was previously resolved, namely that the $200,000 figure is reasonable. Thus, for example, Berkley's *Daubert* challenge to Mr. Muhler's methodology would be fodder for the defense, had Berkley defended its insured in the underlying action, but as framed by Berkley, the *Daubert* issue fails to undercut the essential reasonableness of the original award.

## IV. CONCLUSION

The Court GRANTS in part and DENIES in part Defendant Berkley Aviation's Motion Regarding Plaintiff's Alleged Damages (ECF No. 63). The Court GRANTS

Berkley Aviation's motion as to the claimed damages for the Oxford Aviation paint job in the total amount of $62,175.00 because they are not covered under Berkley Aviation's policy insuring Oxford Aviation and Berkley Aviation's motion as to the claimed damages for travel expenses in the total amount of $10,701.22 because they are not business expenses incurred by Joseph Skilken & Company. The Court DENIES Berkley Aviation's motion as to the rest of the claimed damages for travel expenses and Berkley Aviation's motion insofar as Berkley claims that the $200,000 diminution in value figure is unreasonable.

The Court GRANTS judgment in favor of Joseph Skilken & Company against Berkley Aviation in the total amount of $350,419.55.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of March, 2018